# APPENDIX A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:97CR0141 ERW |
| | ) (TCM) |
| NORRIS G. HOLDER and | ) |
| BILLIE JEROME ALLEN, | ) |
| | ) |
| Defendants. | ) |

### INDICTMENT

### COUNT I

The Grand Jury charges that:

On or about March 17, 1997, in the City of St. Louis within the Eastern District of

Missouri,

### NORRIS G. HOLDER
and
### BILLIE JEROME ALLEN,

the Defendants herein, by force, violence, and intimidation did take from the person or presence

of another, a quantity of United States currency, belonging to, and in the care, custody, control,

management, and possession of the Lindell Bank & Trust Company, the deposits of which were

then insured by the Federal Deposit Insurance Corporation; and in committing such offense did

kill Richard Heflin.

In violation of 18 U.S.C. §§ 2, 2113(a) and (e).

OPTIONAL FORM 99 (7-90)

FAX TRANSMITTAL   # of pages ► 2

To: Rick Sindel     From: Jackie / Judy Mummert
Dept./Agency         Phone # 539-7210
Fax # 721-8545       Fax # 539-3514
NSN 7540-01-317-7368   5000-101   GENERAL SERVICES ADMINISTRATION

04/17/97   16:47   ☏314 539 3514          USDC-ST LOUIS MO                    ☒002

## COUNT II

The Grand Jury further charges that:

On or about March 17, 1997, in the City of St. Louis within the Eastern District of

Missouri,

### NORRIS G. HOLDER
### and
### BILLIE JEROME ALLEN,

the Defendants herein, knowingly used and carried a firearm during and in relation to a crime of

violence which may be prosecuted in a court of the United States, that is, bank robbery as alleged

in Count I of this indictment and incorporated herein; and that in so doing

### NORRIS G. HOLDER
### and
### BILLIE JEROME ALLEN,

the Defendants herein, committed murder as defined in 18 U.S.C. § 1111, that is, the unlawful

killing of Richard Heflin with malice of forethought, such murder being willful, deliberate,

malicious, premeditated, and committed in the perpetration of a robbery.

In violation of 18 U.S.C. §§ 2, 924(c)(1) and (j)(1).

A TRUE BILL.

_____

FOREPERSON

EDWARD L. DOWD, JR.
United States Attorney

_____
JOSEPH M. LANDOLT (#6484)
Assistant United States Attorney

# APPENDIX B

RECEIVED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:97CR141 ERW (TCM) |
| | ) | |
| NORRIS G. HOLDER and | ) | |
| BILLIE JEROME ALLEN, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S NOTICE OF INTENT TO SEEK THE**
**DEATH PENALTY AGAINST DEFENDANT ALLEN**

COMES NOW the United States of America, by and through its attorneys, Edward L. Dowd,

Jr., United States Attorney for the Eastern District of Missouri, and Joseph M. Landolt, Assistant

United States Attorney for said District, and pursuant to 18 U.S.C. § 3593(a) notifies the Court and

Defendant Allen that the Government believes that the circumstances of the offenses charged in the

indictment are such that, in the event of a conviction, a sentence of death is justified under Chapter

228 (Sections 3591-3598) of Title 18 of the United States Code, and that the Government will seek

the sentence of death for the offenses of:  Count I, bank robbery resulting in the death of Richard

Heflin, in violation of 18 U.S.C. §§ 2, 2113(a) and (e), which carries a possible sentence of death,

and; Count II, use of a firearm during and in relation to a federal crime of violence resulting in the

murder of Richard Heflin, in violation of 18 U.S.C. §§ 2, 924(c)(1) and (j)(1), which carries a

possible sentence of death.

The Government proposes to prove the following factors as justifying a sentence of death:

A.  Statutory Proportionality Factors Enumerated Under 18 U.S.C. § 3591(a)(2)(A) through (D)

1.  **Intentional Killing.** The Defendant intentionally killed Richard Heflin.  Section 3591(a)(2)(A).

2.  **Intentional Infliction of Serious Bodily Injury.**  The Defendant intentionally inflicted serious bodily injury that resulted in the death of Richard Heflin.  Section 3591(a)(2)(B).

3.  **Intentional Act To Take A Life Or Use Lethal Force.**  The Defendant intentionally participated in an act, contemplating the life of a person would be taken or intending that lethal force would be used in connection with the person, other than one of the participants in the offense, and Richard Heflin died as a direct result of the act.  Section 3591(a)(2)(C).

4.  **Intentional Act of Violence Which Created a Grave Risk of Death.**  The Defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Richard Heflin died as a direct result of the act.  Section 3591(a)(2)(D).

B.  Statutory Aggravating Factors Enumerated Under 18 U.S.C. § 3592(c)

1.  **Grave Risk of Death to Additional Persons.**  The Defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense.  Section 3592(c)(5).

2.  **Heinous, Cruel, or Depraved Manner of Committing Offense.**  The Defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Richard Heflin.  Section 3592(c)(6).

3.  **Commission of the Offense for Pecuniary Gain.**  The Defendant committed the

2

3. **Commission of the Offense for Pecuniary Gain.** The Defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. Section 3592(c)(8).

4. **Substantial Planning and Premeditation.** The Defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism. Section 3592(c)(9).

5. **Multiple Killings or Attempted Killings.** The Defendant intentionally killed or attempted to kill more than one person in a single criminal episode. Section 3592(c)(16).

C. Other, Non-Statutory, Aggravating Factors Identified Under 18 U.S.C. § 3593(a)(2)

1. **Vileness of the Crime.** The Defendant's conduct in committing the offenses was substantially greater in degree than that described in the definition of the crimes, apart from the statutory aggravating factors. Smith v. Commonwealth, 248 S.E.2d 135 (1978), cert. denied, 441 U.S. 961 (1979).[1]

2. **Future Dangerousness of the Defendant.** The Defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society. Simmons v. South Carolina, 114 S. Ct. 2187, 2193 (1994).

a) Specific Threats of Violence. The Defendant has threatened to commit other acts of violence, in addition to the capital offenses committed in this case and the statutory factors alleged in this Notice. The Government will provide Defendant with specific information regarding these threats of violence.

---

[1] This factor will only be submitted to the jury in the alternative to the statutory aggravating factor set forth in paragraph B(2), "heinous, cruel, or depraved manner of committing the offense," pursuant to 18 U.S.C. § 3592(c)(6), or in the event that the § 3592(c)(6) statutory aggravating factor is not submitted to the jury.

b) <u>Low Rehabilitative Potential</u>. Efforts to rehabilitate and/or deter the Defendant from criminal conduct have failed, as evidenced by, among other things, the fact that Defendant was being supervised by the Missouri Board of Probation and Parole for a previous offense at the time of Defendant's commission of the capital offenses in this case.

c) <u>Lack of Remorse</u>. The Defendant has demonstrated a lack of remorse for the capital offenses committed in this case, by statements and/or actions.

3. **Other Criminal Activity**. The Defendant has committed, attempted to commit, and/or threatened to commit other criminal acts, in addition to the capital offenses committed in this case and the statutory factors alleged in this Notice, including but not limited to one or more of the following:

a) The Defendant committed the felony of tampering in the first degree on or about the 10th day of April 1995, in the City of St. Louis, as set out more fully in St. Louis Metropolitan Police Department Complaint No. 95-050849 and the records of the Circuit Court for the City of St. Louis, Missouri, in the matter of <u>State of Missouri v. Billie J. Allen</u>, Cause No. 951-0001280.

b) The Defendant committed the felony crime of tampering in the first degree on or about October 2, 1995, as more fully described in St. Louis Metropolitan Police Department Complaint No. 95-14694.

4. **Victim Impact Evidence**. Richard Heflin's personal characteristics as an individual human being and/or the impact of the death of Richard Heflin upon his family. <u>Payne v. Tennessee</u>, 111 S. Ct. 2597, 2608-09 (1991).

a) <u>Characteristics</u>. Mr. Heflin's personal characteristics as an individual human being include but are not limited to one or more of the following:

4

i)   Mr. Heflin was a decorated veteran of the Vietnam War.

ii)  Mr. Heflin was former member of the Caseyville, Illinois Police Department.

iii) Mr. Heflin was a loyal and valued employee of Lindell Bank & Trust Company.

iv)  Mr. Heflin had a lively sense of humor, was a well-liked friend and coworker and was a valuable member of society.

b)   Impact of Death. Mr. Heflin's family has suffered injury and loss, as a result of his death, including but not limited to one or more of the following:

i)   Mr. Heflin was the loving and caring father of three children: Jason Heflin, 22 years of age; Richard Heflin, III, 17 years of age; and Justin Heflin, 14 years of age. Each of Mr. Heflin's children miss his love, affection, guidance, companionship, and support.

ii)  Mr. Heflin was the loving and caring husband of Dana Heflin whom he married in 1996. Dana Heflin misses his love, affection, companionship, and support.

iii) Richard Heflin provided financial support for his former wife, Susan Heflin, who is now without that support.

iv)  Richard Heflin was the loving and caring son of Mr. and Mrs. Richard Heflin, Sr. Mr. Heflin's parents miss his love, affection, and companionship.

v)   Mr. Heflin was the loving and caring brother of Gina Heflin, Sherry Holmes,

5

Donna Hawks, Michael Heflin, and Glen Heflin. Mr. Heflin's siblings miss his love, affection, and companionship.

Respectfully submitted,

EDWARD L. DOWD, JR.
United States Attorney

JOSEPH M. LANDOLT (#6484)
Assistant United States Attorney

8/8/97
Date

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing was mailed this ____ day of August 1997, postage prepaid United States Mail first class to:

Richard Sindel
Attorney for Defendant Allen
8008 Carondelet, Suite 301
Clayton, Missouri   63105

and

Charles M. Shaw
Attorney for Defendant Holder
222 S. Meramec
Clayton, Missouri   63105

ASSISTANT UNITED STATES ATTORNEY

6

# APPENDIX C

## I. THE FDPA

The FDPA sets forth the procedure for all capital cases. 18 U.S.C. § 3591(a)(2). Under the FDPA, the Government must notify a defendant "a reasonable time before trial or before acceptance by the court of a plea of guilty" that it intends to seek the death penalty against that defendant. 18 U.S.C. § 3593(a)(1). The statute further provides that a jury, in determining whether a defendant should receive a sentence of death, {2003 U.S. Dist. LEXIS 6} must decide at a "separate sentencing hearing" whether the defendant is eligible for the death penalty and, if so, whether the defendant should actually receive the death penalty. 18 U.S.C. § 3593(b).

For a defendant to be eligible for the death penalty in a homicide case, the government must prove beyond a reasonable doubt that the defendant had the requisite mental culpability of 18 U.S.C. § 3591(a)(2), and that a least one of the sixteen statutory aggravating factors of 18 U.S.C. § 3592(c) was present. If the jury determines that the Government has met its burden as to both "eligibility" requirements, the jury proceeds to its "selection" decision, where it must consider whether all of the existing aggravating factors, both statutory and nonstatutory, § 3592(c), outweigh all mitigating factors, § 3592(a), such that a sentence of death is justified, § 3593(e). The Government must prove all aggravating factors beyond a reasonable doubt, while a defendant must only establish the existence of mitigating factors by a preponderance of the evidence. § 3593(c). For a death sentence to be imposed, the jury must be{2003 U.S. Dist. LEXIS 7} unanimous. § 3593(e).

## II. THE NECESSITY OF INCLUSION

The Supreme Court held, in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. "In federal prosecutions, such facts must also be charged in the indictment." *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 1783, 152 L. Ed. 2d 860 (2002) (citing *Apprendi*, 530 U.S. at 476); *see also Jones v. United States*, 526 U.S. 227, 243 n.6, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999) ("Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."). 2 *Apprendi* focused its inquiry on the role of the petit jury in adjudicating guilt, finding that it "is unconstitutional for a legislature to remove from the jury{2003 U.S. Dist. LEXIS 8} the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (quoting *Jones*, 526 U.S. at 252-53 (Stevens, J, concurring)).

In *Ring*, the Supreme Court applied the lessons of *Apprendi* to the oft-litigated death penalty scheme in Arizona. In *Ring*, the Defendant was charged with violating Ariz. Rev. Stat Ann. § 13-1105(C){2003 U.S. Dist. LEXIS 9} after he allegedly murdered the driver of an armored car. *Ring*, 122 S. Ct. at 2434. The statute "prescribes that the offense 'is punishable by death or life imprisonment as provided by § 13-703.'" *Id.* (quoting Ariz. Rev. Stat. Ann. § 13-1105(C)). Once a determination of factual guilt is made under § 13-1105(C), section 13-703 directs the trial Judge to then "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated] circumstances . . . for the purpose of determining the sentence to be imposed." *Id.* The hearing, as provided in § 13-703, "shall be conducted before the court alone. The court alone shall make all factual determination required by this section or the constitution of the United States or this state." *Id.* The trial judge weighs a series of enumerated aggravating factors against any mitigation evidence presented by the defendant. A death sentence may then be imposed "if there is at least

3yfcases                                          1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

one aggravating circumstance and 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.* at 2435 (quoting Ariz. Rev. Stat. Ann. § 13-703(F).{2003 U.S. Dist. LEXIS 10} ).

After the jury convicted Ring of felony murder, the trial judge conducted the requisite hearing and sentenced Ring to death. The Arizona Supreme Court affirmed the conviction, relying on the opinion of the Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), where the Supreme Court had overtly approved of the Arizona death penalty statutory scheme. Ring sought a writ of certiorari, based on *Apprendi.*

In *Ring*, the Supreme Court reversed its *Walton* opinion, holding that *Apprendi* overruled the prior case. *See Ring*, 122 S. Ct. at 2443 ("Accordingly, we overrule *Walton* to the extend that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." (citation omitted)). The Court noted that "based solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* at 2437. This is the case under Arizona law because "a death sentence may not legally be imposed . . . unless at least one aggravating factor is found to exist beyond a reasonable doubt.{2003 U.S. Dist. LEXIS 11} " *Id.* Under the statutory scheme in Arizona, this determination -- a factual finding based on evidence presented at an additional, post-trial hearing -- was made by the judge alone, sitting without a jury.

> If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact -- no matter how the State labels it -- must be found by a jury beyond a reasonable doubt. A defendant may not be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone. *Id.* at 2439-40 (internal citations and quotations omitted).

Thus, "in effect, the required finding of an aggravated circumstance exposed Ring to a greater punishment than that authorized by the jury's guilty verdict." *Id.* at 2440. Under *Apprendi*, such factual findings are required to be submitted to the jury for a finding beyond a reasonable doubt, as the "enumerated factors operate as 'the functional equivalent of an element of a greater offense'" required by the Sixth Amendment to "be found by a jury." *Id.* at 2443 (quoting *Apprendi*, 530 U.S. at 494 n. 19). Or, as stated by{2003 U.S. Dist. LEXIS 12} Justices Scalia and Thomas in their concurrence, "what today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed." *Id.* at 2445 (Scalia, J., concurring).

Notably, in filing his appeal with the Supreme Court, Ring did "not contend that his indictment was constitutionally defective. *See Apprendi*, 530 U.S. at 477 n.3, 147 L. Ed. 2d 435, 120 S. Ct. 2348 ('Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury'"')." *Ring*, 122 S. Ct. at 2437 n.4. Relying on this footnote, the Fifth Circuit recently concluded in evaluating the direct appeal of a case under the FDPA that "*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors." *United States v. Bernard*, 299 F.3d 467, 488-89 (5th Cir. 2002). However, within a week of deciding *Ring*, the Supreme Court issued the following cryptic order in *Allen v. United States*, 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002):

> On petition for writ of certiorari to the United States Court of Appeals{2003 U.S. Dist. LEXIS 13} for the Eighth Circuit. Motion of petitioner for leave to proceed *in forma pauperis* and petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Eighth Circuit for further consideration in light of *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

3yfcases                                          2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*Allen* involved the conviction under the FDPA of a group of armed bank robbers who, during the course of robbing a bank in Saint Louis, Missouri, murdered one of the bank's security guards. *See Allen*, 247 F.3d 741, 755 (8th Cir. 2001), *vacated and remanded*, 536 U.S. 953, 153 L. Ed. 2d 830, 122 S. Ct. 2653 (2002). On appeal, the defendants pled a litany of constitutional defects in both the FDPA and the events that occurred during their arrest and trial. Among these challenges, as relevant to the case at bar,

> Allen specifically argues that his sentence was imposed in violation of the Fifth Amendment's Indictment Clause because the FDPA fails to require that the decision to seek the death penalty, just like the decision to charge a defendant with a federal offense, be routed through the Grand Jury.{2003 U.S. Dist. LEXIS 14} Allen also argues that the government's failure to allege in his indictment both the mental culpability factor from § 3591(a) and the aggravating factors from § 3592(c) upon which it relied during the sentencing as the justification for imposing a death sentence constitutes constitutional error in light of the Supreme Court's recent rulings in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999). *Allen*, 247 F.3d at 761.

The Eighth Circuit began by rejecting the initial Fifth Amendment challenge. It noted that because "§ 2113(e) . . . specifically authorize[s] the death penalty as punishment for any defendant found guilty of the listed offense, the Fifth Amendment's Indictment Clause is satisfied." *Id.* at 762. The court concluded that the aggravating factors set forth in the FDPA "do not increase the maximum sentence set forth in each of the statutes for the specific offenses alleged in the indictment and thus do not amount to separate elements that must be alleged in the indictment." *Id.*{2003 U.S. Dist. LEXIS 15} (citing *Apprendi*, 530 U.S. at 489-490; *Jones*, 526 U.S. at 251).

It then turned to the *Apprendi* issue, the "contention that aggravating factors and mental culpability factors must be alleged in an indictment in order to satisfy the Fifth Amendment." *Allen*, 247 F.3d at 762. First, the court noted that "the structure of the two statutes indicates that neither factor is an element of the offense of conviction . . . . Congress did not make the mental culpability factors or statutory aggravating factors elements of the underlying offense." *Id.* at 762-63. It next evaluated whether, as with the New Jersey statute in *Apprendi* or the Arizona death penalty statute in *Ring*, "the mental culpability factors and statutory aggravating factors are deemed elements of the crime by virtue of being facts which are the basis for increasing the maximum punishment." *Id.* at 763 (citing *Apprendi*, 530 U.S. at 489-90); *see also Apprendi*, 530 U.S. at 501 (Thomas, J., concurring) ("Every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that{2003 U.S. Dist. LEXIS 16} mitigates punishment)" is an element of the crime; thus, "the aggravating fact is an element of the aggravated crime."). The court concluded:

> We think that when read in the context of the Supreme Court's decisions interpreting the Eighth Amendment in death cases over the past two decades, these two features of the FDPA [mental culpability factors and statutory aggravating factors] are properly characterized as sentencing protections that shield a defendant from automatically receiving the statutorily authorized death sentence. *Allen*, 247 F.3d at 763.

Instead of viewing a conviction under 18 U.S.C. § 2113(e) as "assuming that a life sentence is the initial baseline" from which a jury could depart upward to a sentence of death under the FDPA, the Eighth Circuit found that the statute expressly authorizes "a maximum penalty of death and the sentencing factors of mental culpability and aggravating circumstances do not increase the sentencing range but rather provide the particularized standards for choosing which of the alternative available sentences should be imposed." *Id.* In arriving at this conclusion, however, the court{2003 U.S. Dist. LEXIS 17} relied directly on the opinion of the Supreme Court in *Walton. See Allen*, 247

3yfcases                                    3

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

F.3d at 764 ("*See Walton*, 497 U.S. at 648, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (explaining that aggravating circumstances are not separate penalties or offenses but rather are "standards to guide the making of the choice between the alternative verdicts of death and life imprisonment") (quoting *Poland v. Arizona*, 476 U.S. 147, 156, 106 S. Ct. 1749, 90 L. Ed. 2d 123 (1986)).").

*Ring* overruled this view of the Arizona death penalty scheme. *See Ring*, 122 S. Ct. at 2443 ("For the reasons stated, we hold that *Walton* and *Apprendi* are irreconcilable; our *Sixth Amendment* jurisprudence cannot be home to both. Accordingly, we overrule *Walton* . . . because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'. . . ." (quoting *Apprendi*, 530 U.S. at 494 n.19) (emphasis added)). Importantly, the ruling in *Ring* rests solely on the Sixth Amendment question of whether or not the aggravating factors must be found by a jury and does not, as the Fifth Circuit noted in *Bernard*{2003 U.S. Dist. LEXIS 18} , address the adequacy of the indictment under the Fifth Amendment. *Bernard*, 299 F.3d 467, 488-89; *see Ring*, 122 S. Ct. at 2437 n.4.

The Court does not attribute the same significance to this notation as does the Fifth Circuit. The Supreme Court held well over one hundred years ago that the indictment protections found in the Fifth Amendment do not apply to the states, and it has not wavered from that opinion. *See Hurtado v. California*, 110 U.S. 516, 28 L. Ed. 232, 4 S. Ct. 111 (1884). Therefore, *Ring* (like *Apprendi*) could not rely on the Fifth Amendment in challenging his conviction. Indeed, the Supreme Court noted this fact in the text of the *Apprendi* opinion: "That Amendment [the Fourteenth Amendment] has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' . . . . We thus do not address the indictment question separately today." *Apprendi*, 530 U.S. at 477 n.3.

Pennington, however, does enjoy the protections of the Fifth Amendment's Grand Jury clause, as did Allen. Although the *Ring* opinion discusses its view of the aggravating factors in light of the Sixth{2003 U.S. Dist. LEXIS 19} Amendment, the opinion in *Jones* indicates that the Court applies a similar view to the requirements of an indictment. *See Cotton*, 122 S. Ct. at 1783 ("In *Apprendi* . . ., we held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. In federal prosecutions, such facts must also be charged in the indictment." (internal citations, quotation marks, and alterations omitted)).

Taken together with the vacation of the *Allen* opinion, these opinions of the Supreme Court compel the construction of the indictment offered by Pennington -- i.e., the indictment must include the mental intent and statutory aggravating factors in order to charge a capital offense. Like the Arizona statute at issue in *Ring*, 18 U.S.C. § 2113(e) allows the imposition of a death sentence only through the incorporation of a different statute. *Compare* Ariz. Rev. Stat. Ann. § 13-1105(C) (murder "is punishable by death or life imprisonment as provided by § 13-703") *with* 18 U.S.C. § 2113(e){2003 U.S. Dist. LEXIS 20} ("Whoever, in committing any offense defined in this section . . . kills any person . . . shall be punished by death or life imprisonment") *and* 18 U.S.C. § 3591(a)(2) ("A defendant who has been found guilty of any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at a hearing under section 3593 intentionally killed the victim . . . shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593 . . . ."). Like in Arizona, before a death sentence may be imposed by a federal court, the factfinder is required to find certain additional factors -- factors that do not appear in the substantive statute defining the crime. A sentence of death under the FDPA is "contingent on the finding of a fact" beyond that required to convict the defendant of the substantive crime. *Ring*, 122 S. Ct. at 2439 (citation omitted). Because the enumerated aggravating factors and mental intent findings in the FDPA both "operate as 'the

3yfcases

4

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

functional equivalent of an element of a greater offense,'" *id.* at 2443 (quoting{2003 U.S. Dist. LEXIS 21} *Apprendi*, 530 U.S. at 494 n.19), those "elements must be charged in the indictment." *Jones*, 526 U.S. at 232. 3

{2003 U.S. Dist. LEXIS 22} III. IMPLIED INCLUSION

Here, as pointed out by Pennington in his brief, jeopardy has already attached for purposes of the Double Jeopardy clause. *See United States v. Bearden*, 274 F.3d 1031, 1037-38 (6th Cir. 2001) ("We hold that jeopardy attaches only when the district court accepts the defendant's guilty or nolo contendere plea."). 4 Therefore, the Government may not return to the Grand Jury to obtain a superseding indictment. *Cf. United States v. Fisher*, 871 F.2d 444, 451 n.7 (3d Cir. 1989) ("A superseding indictment maybe obtained by the government at any time prior to trial.") (citing *United States v. Edwards*, 777 F.2d 644, 649 (11th Cir. 1985)); *United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991) (same); *United States v. Kouri-Perez*, 47 F. Supp. 2d 166, 169 (D.P.R. 1999) (same) (citing *United States v. Del Vecchio*, 707 F.2d 1214, 1216 (11th Cir. 1983); *United States v. Stricklin*, 591 F.2d 1112, 1115 n.1 (5th Cir. 1979)).

{2003 U.S. Dist. LEXIS 23} The Government argues that there is no need to obtain a superseding indictment because the statutory aggravating factors and mental states are included in the existing indictment by implication. The Indictment alleges that

> on or about February 13, 2001, in the Western District of Kentucky, Jefferson County, Kentucky, the defendants, Tiffany Dominique Pennington and Derrick Djuan Moore, each aided and abetted by the other, by force, violence, and intimidation took from bank employees approximately $ 3,760.00 in money belonging to and in the care, custody, control, management, and possession of the National City Bank, 3800 Brownsboro Road, Louisville, Kentucky, the deposits of which were then and there insured by the Federal Deposit Insurance Corporation, and in committing such offense, the defendants did kill a bank employee whose identity is known to the Grand Jury.(Indictment at 3.)

In its Notice of Intent to Seek the Death Penalty (Dkt. # 42), the Government elected to pursue the following three alternative mental states: (1) intentionally inflicting serious bodily injury that results in the death of the victim, 18 U.S.C. § 3591(a)(2)(B); {2003 U.S. Dist. LEXIS 24} (2) intentionally participating in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, where the victim dies as a direct result of the act, 18 U.S.C. § 3591(a)(2)(C); and (3) intentionally and specifically engaging in an act of violence, knowing that the act creates a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constitutes a reckless disregard for human life, and the victim dies as a direct result of the act, 18 U.S.C. § 3591(a)(2)(D). (Dkt. # 42 at 2.) Further, it gave notice of two statutory aggravating factors: (1) knowingly creating a grave risk of death to other persons in addition to the victim of the offense during the course of the offense, 18 U.S.C. § 3592(c)(5); and (2) committing the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value, 18 U.S.C. § 3592(c)(8). (Dkt. # 42 at 3.)

The Government contends that the intent{2003 U.S. Dist. LEXIS 25} factors are included in the Indictment because Count 3 states that the Defendant committed the offense of bank robbery -- an act of violence -- and that during the course of the robbery he killed a bank employee. This language, the Government asserts, sufficiently informs the Mr. Pennington of the charges against him. The Government makes a similar argument regarding the statutory aggravating factor of pecuniary gain, 5 maintaining that "although not phrased in the same language as 18 U.S.C. § 3592(c)(8), the plain language of Count 3 of the Indictment provides fair notice to the defendant of

3yfcases

5

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the aggravating factor of pecuniary gain." (Dkt. 199 at 5.)

What the Government's contentions fail to address, however, is that an indictment serves three distinct functions: (1) it presents the essential elements of{2003 U.S. Dist. LEXIS 26} the charged offense for the grand jury's consideration; (2) it notifies the accused of the of the charges to be defended against; and (3) it enables the accused to plead an acquittal or conviction as a bar to subsequent prosecutions for the same offense. See United States v. Woodruff, 296 F.3d 1041, 1046 (11th Cir. 2002); United States v. Stubbs, 279 F.3d 402, 407 (6th Cir. 2002). An indictment is required to present the offense's essential elements not merely to notify the defendant of the charges against him, but to ensure that the grand jury finds probable cause to believe that the accused committed each element of the offense. United States v. Cabrera-Teran, 168 F.3d 141, 143 (5th Cir. 1999); see United States v. Hart, 640 F.2d 856, 857 (6th Cir. 1981). If an essential element is not expressly included in the indictment, the grand jury's role of determining probable cause is circumvented as to that omitted element.

In some cases, an omitted element can be impliedly included in an indictment because a finding of probable cause upon the indictment's contents necessarily includes a finding of probable cause as to{2003 U.S. Dist. LEXIS 27} that omitted element. For example, here, it would be possible to read intent to rob into the fact that the indictment alleged that Pennington committed the offense of bank robbery. See United States v. Woodruff, 296 F.3d 1041, 1048 (11th Cir. 2002) ("It is difficult to imagine how a person could 'unlawfully take and obtain personal property . . . by means of actual and threatened force, violence, and fear of immediate injury' by mistake or accident. The very use of the tools of violence . . . for the specific purpose of taking the property of another can only be imagined as being done knowingly -- that is, voluntarily and intentionally."); United States v. Hodge, 211 F.3d 74, 77-78 (3d Cir. 2000). However, the mere fact that a defendant intentionally committed the crime of bank robbery does not necessarily imply that the defendant either (1) intended to inflict serious bodily injury upon anyone, (2) contemplated that a person's life would be taken or intending that lethal force be used against someone, or (3) intentionally and specifically engaged in an act of violence, knowing that the act creates a grave risk of death to another person, such that{2003 U.S. Dist. LEXIS 28} the defendant's conduct constitutes a reckless disregard for human life. Similarly, the mere fact that the bank robbery was obviously committed "as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value" does not necessarily imply that the victim was killed for that reason. 6 It would be possible, for example, for an accused to intentionally commit bank robbery and then accidentally run over an absentminded and at-fault pedestrian while driving away from the bank, or to fling open the door to the bank, inadvertently hitting a passer-by with the door and causing the passer-by to fall and suffer a fatal head injury. With regard to the "pecuniary gain" aggravator, it is also possible that a bank robber could kill a victim to prevent that person from revealing the thief's identity. See Bernard, 299 F.3d at 483-84 (pecuniary gain aggravator inapplicable where evidence established that defendants killed their victims to prevent them from reporting the robbery to the police). 7

Thus, while it is true that "an indictment must be 'read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied,'" Samuels v. United States, 16 F.3d 1221 (table), 1994 U.S. App. LEXIS 2699, 1994 WL 47796, at *2 (6th Cir. Feb. 15, 1994) (quoting United States v. Martin, 783 F.2d 1449, 1452 (9th Cir. 1986)), it by no means certain that the requisite mens rea and pecuniary gain statutory aggravating factor are impliedly included in Pennington's Indictment. Correspondingly, the mental state and pecuniary gain statutory aggravating factor are not necessarily included by implication in the Grand Jury's{2003 U.S. Dist. LEXIS 30} finding of probable cause upon that indictment. While the indictment's notice function (as well as its double jeopardy function) might not be offended by reading intent and pecuniary gain into

3yfcases

6

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Pennington's Indictment, such implied inclusion cannot be accomplished without trampling upon the prerogative of the Grand Jury to evaluate probable cause as to every essential element of the offense.

IV. "WAIVER" 8

{2003 U.S. Dist. LEXIS 31} As a general matter, a "plea of guilty by a prisoner in open court constitutes an admission of guilt and waiver of all non-jurisdictional defects and defenses, and admits all facts alleged in the indictment." *United States v. Parker*, 292 F.2d 2, 3 (6th Cir. 1961); *accord Smith v. United States*, 447 F.2d 487, 488 (5th Cir. 1971) ("As the district court correctly held, a valid plea of guilty constitutes a waiver of all non-jurisdictional defects and defenses." (citations omitted)); *Weisberg v. Minnesota*, 29 F.3d 1271, 1279 (8th Cir. 1994) ("As a general rule, a defendant's knowing and intelligent guilty plea forecloses independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."). Although it was not entirely clear at the time of Pennington's original motion whether he waived his *Apprendi/Ring* objection to the Indictment by pleading guilty, the issue now seems to be settled in this Circuit in light of the recent decision of *United States v. Stewart*, 306 F.3d 295 (6th Cir. 2002), *cert. denied*, 537 U.S. 1138, 154 L. Ed. 2d 832, 123 S. Ct. 930 (2003), and 537 U.S. 1146, 154 L. Ed. 2d 847, 123 S. Ct. 946 (2003).{2003 U.S. Dist. LEXIS 32} In *Stewart*, a large group of defendants were indicted for participation in an extensive drug conspiracy. "However, the superseding indictment failed to allege the quantity of drugs attributable to each Defendant . . . ." *Id.* at 303. After guilty pleas by some defendants and guilty verdicts as to other defendants, the trial judge sentenced the defendants to greater terms of imprisonment than would otherwise have been available under the superseding indictment.

No defendant raised an objection to the indictment's omissions prior to adjudication of guilt (either through the entry of a guilty plea or through a jury verdict). However, the court concluded this did not result in the defendants waiving their *Apprendi* objection to the indictment, noting that

> it would be imprudent for defense counsel to object to an indictment which, by all rights, is facially sound. To do so would be in direct opposition to his client's penal interests; the only logical outcome of such a challenge would be for the government to replace the charge under 21 U.S.C. § 841 with a more specific charge, specifically alleging a drug quantity, which might expose the defendant{2003 U.S. Dist. LEXIS 33} to a higher statutory penalty range. Instead of objecting to a valid indictment or jury instruction, the proper time for a defendant to raise a challenge to his sentence is at the time the actual violation occurs -- at the time of sentencing. *Id.* at 310 (citing *United States v. Jackson*, 240 F.3d 1245, 1248 (10th Cir. 2001)); *accord United States v. Candelario*, 240 F.3d 1300, 1304-05 (11th Cir. 2001). The court then evaluated the case, and concluded that the two defendants who went to trial had properly preserved their *Apprendi* error claims to both the indictment and adjudication of drug quantity by the jury because they raised the claims at the sentencing hearing. *Stewart*, 306 F.3d at 312 ("While before the district court, the Benfords contended that the *Jones* decision required that the drug amounts be charged in their indictments . . . .").

In light of *Stewart*, it is clear in the Sixth Circuit that a defendant does not waive his *Apprendi* objection by entering a guilty plea upon a "defective" 9 indictment. Consequently, Pennington did not waive his ability to raise an *Apprendi* challenge to the Indictment{2003 U.S. Dist. LEXIS 34} by pleading guilty. 10

{2003 U.S. Dist. LEXIS 35} V. THE CONSEQUENCE OF THE INDICTMENT'S OMISSIONS

Having determined that the Indictment does not properly charge a capital offense, that Pennington

3yfcases                                          7

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

has not waived his right to object to the Indictment's omissions, and that the Government cannot remedy the omissions by returning to the Grand Jury to obtain a superseding indictment, the Court is now faced with the difficult task of determining what effect the Indictment's failure to include the "eligibility" requirements -- at least one statutory aggravating factor from 18 U.S.C. § 3592(c) and mental culpability requirement of 18 U.S.C. § 3291 -- has upon the present case. As in *Stewart*, the question thus becomes "how to resolve the [Defendant's] *Apprendi* challenges." *Stewart*, 306 F.3d at 318.

In *Stewart*, the Sixth Circuit (looking to the Supreme Court's decision in *Cotton, supra*) adopted the view expressed by the Tenth Circuit in *United States v. Prentiss*, 256 F.3d 971 (10th Cir. 2001) (en banc), that "an indictment's failure to allege an element of a crime is not jurisdictional in the sense that it affects a court's subject{2003 U.S. Dist. LEXIS 36} matter jurisdiction, i.e., a court's constitutional or statutory power to adjudicate the case." *Id.* at 321 (quoting *Prentiss*, 256 F.3d at 982 (internal citation and alteration omitted)). It also rejected the view that omission of drug quantity from the indictment constitutes "structural error." 11 *Id.* Relying on *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999), the court noted that the Supreme Court "has identified 'a limited class of fundamental constitutional errors that defy analysis by harmless error standards.'" *Id.* (quoting *Neder*, 527 U.S. at 7).

> Structural errors require automatic reversal, despite the effect of the error on the trial's outcome. *Id.* As for all other errors, "courts *must* apply Fed. R. Crim. P. 52(a)'s harmless error standards, and disregard errors that are harmless beyond a reasonable doubt. *Neder*, 527 U.S. at 7, 144 L. Ed. 2d 35, 119 S. Ct. at 1833 (emphasis in original). The error complained of in the instant case is not among those listed in *Neder* that classify as structural. *Id.* (footnote omitted).

{2003 U.S. Dist. LEXIS 37} Since *Apprendi* errors are neither jurisdictional nor structural, the *Stewart* decision seems to indicate that a court reviewing an ordinary *Apprendi* challenge to the indictment, properly objected to by the defendant, applies the harmless error standard in Fed. R. Crim. P. 52(a). 12 *See Stewart*, 306 F.3d at 322 ("Harmless error analysis is appropriate under the facts of this case."); *see also United States v. Copeland*, 304 F.3d 533, 554, 556 (6th Cir. 2002) (following *Stewart* in applying harmless error analysis to defendant's objection to trial court's drug quantity determination), *cert. denied*, 537 U.S. 1145, 123 S. Ct. 950, 154 L. Ed. 2d 845 (2003); *Candelario*, 240 F.3d at 1306-07 (preserved *Apprendi* errors subject to harmless error review). Thus, it appears to logically follow that the harmless error standard in Fed. R. Crim P. 52(a) should apply to the current circumstance. After all, the omitted statutory aggravating factors and mental culpability requirements are analytically no different than the omitted drug{2003 U.S. Dist. LEXIS 38} quantity in *Stewart*.

{2003 U.S. Dist. LEXIS 39} However, the fact that only the former provides an avenue for application of the death penalty makes the two otherwise close conceptual analogues significantly dissimilar. "Death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida*, 430 U.S. 349, 357, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977) (plurality). Indeed, "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976) (plurality); *see Gardner*, 430 U.S. at 360 (plurality) ("The extinction of all possibility of rehabilitation is one of the aspects of the death sentence that makes it different in kind from any other sentence a State may legitimately impose."); *Furman v. Georgia*, 408 U.S. 238, 306, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) (Stewart, J., concurring) ("The penalty of death . . . is unique in its total irrevocability[;] . . . unique in its rejection of rehabilitation[;] . . . [and] unique . . . in{2003 U.S. Dist. LEXIS 40} its absolute renunciation of all that is embodied in our concept of humanity.").

3yfcases

**8**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

"From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action." *Gardner*, 430 U.S. at 357. Defendant argues that this difference makes harmless error analysis inappropriate in the present context.

The Supreme Court, however, has applied harmless error review to cases involving the death penalty. *See, e.g., Jones v. United States*, 527 U.S. 373, 402-05, 144 L. Ed. 2d 370, 119 S. Ct. 2090 (1999); *Sochor v. Florida*, 504 U.S. 527, 532, 539-41, 119 L. Ed. 2d 326, 112 S. Ct. 2114 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 752-53, 108 L. Ed. 2d 725, 110 S. Ct. 1441 (1990). 13 Admittedly, the Supreme Court has not applied the harmless error test to an *Apprendi* error in a capital case. Nonetheless, the Supreme Court's use of the harmless error standard in the capital setting indicates that the Court does not believe that a harmless error analysis is categorically inappropriate in a capital{2003 U.S. Dist. LEXIS 41} case. Further, 18 U.S.C. § 3595(c)(2) provides that federal death sentences are not to be set aside on appeal based upon errors that are harmless beyond a reasonable doubt.

Considered together, the analytical near-indistinguishability between the drug cases and the present case, the Supreme Court's previous use of harmless error review in capital cases, and § 3595(c)(2)'s mandate of a harmless error standard on appellate review of federal death sentences lead this Court to conclude that *Apprendi* errors in capital sentencing must be subject to a harmless error review. Although the Court is aware that "death is different," an indictment's{2003 U.S. Dist. LEXIS 42} failure to include the "functional equivalent of elements" statutory aggravating factors and mental state requirements is not significantly dissimilar from an indictment's omission of the "functional equivalent of an element" drug quantity, which is unquestionably subject to harmless error review under *Stewart. See Bernard*, 299 F.3d at 489 (applying plain error analysis to defendant's unpreserved objection that mental state and statutory aggravating factors were not alleged in the indictment or found by the grand jury).

Although the harmless error inquiry is generally appropriate in cases where the death penalty is sought, it does not necessarily follow that harmless error review is appropriate in this case. Because Pennington's objection comes prior to the sentencing phase, the Court is put in a position much different than that of an appellate court reviewing a defendant's *Apprendi* objection. There, the error -- imposing a sentence not authorized by the indictment and/or jury verdict -- has already occurred, and the appellate court may examine the committed error in the larger context of the record as a whole. Here, however, no error has yet occurred, so a harmless{2003 U.S. Dist. LEXIS 43} error review would essentially require that the Court first admit it should not allow the Government to pursue the death penalty, then proceed to determine the effect of its admitted error. 14 Such an approach is both illogical and improper. *Davis*, No. 94-381, Dkt. # 1080, at 18 n.25. Accordingly, the Government, having failed to allege in the Indictment or submit to the Grand Jury the statutory aggravating factors and mens rea requirements, cannot seek the death penalty against Mr. Pennington.

Even if harmless error review were appropriate in the present circumstance, the error here cannot be{2003 U.S. Dist. LEXIS 44} considered harmless. Where an infringement upon a constitutional right is subject to a harmless error inquiry, the court may only correct the error where (1) there was in fact an error, (2) that was plain, and (3) that affected substantial rights. *Stewart*, 306 F.3d at 322. The "government bears the burden of showing that the error had no effect on a defendants' substantial rights." *Id.*

Based upon the previous discussion, *supra* Part II, it is apparent that both the first and second prongs have been met. *See Johnson v. United States*, 520 U.S. 461, 467-68, 137 L. Ed. 2d 718, 117 S. Ct.

3yfcases

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

1544 (1997) (error is "plain" where it is clear or obvious at the time of either trial or appeal). Regarding the third prong, however, there are two competing views of "substantial rights" in the context of *Apprendi* errors. As the Supreme Court acknowledged in *Cotton*, one interpretation is that a defendant's substantial rights are affected any time he is subjected to additional years of imprisonment not authorized by the indictment and/or jury verdict, while a competing view provides that a defendant's substantial rights are only affected when the omitted quasi-element{**2003 U.S. Dist. LEXIS 45**} is not supported by overwhelming and uncontroverted evidence. *See Cotton*, 122 S. Ct. at 1786 n.2. The Supreme Court declined to resolve the dispute, however, and instead decided *Cotton* on other grounds. *Id* at 1786.

Prior to *Cotton*, the Sixth Circuit adopted the first view of the "substantial rights" determination in *United States v. Page*, 232 F.3d 536, 544 (6th Cir. 2000). *Page* involved defendants who were convicted of drug offenses under 21 U.S.C. §§ 841and 846. Although neither indictment nor jury verdict specified drug quantity, the district court calculated the amount of drugs attributable to each defendant at a sentencing hearing, then sentenced each defendant to a prison term exceeding the applicable baseline sentence range based upon his findings as to drug quantity.

Because the defendants failed to object that the jury, not the district judge, should have made the quantity determination, the court of appeals reviewed the case for plain error. *Id.* at 543. Under the plain error test, a defendant must establish the existence of the three elements required by the harmless error test ((1) {**2003 U.S. Dist. LEXIS 46**} an error, (2) that was plain, (3) that affected substantial rights) as well as demonstrate that the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997) (citation and quotation marks omitted). In addition to adding a fourth element, the plain error test differs from the harmless error test in that the burden is on the defendant, not the government, to prove the third prong. *Stewart*, 306 F.3d at 322.

After the panel concluded that there had been an error that was plain, the court turned to the third prong of the plain error/harmless error analysis:

An error affects substantial rights when the error was prejudicial, that is, when it "affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). There is no doubt that imposing additional years of imprisonment beyond that authorized by a jury's verdict affects a defendant's substantial rights. *See United States v. Barajas-Nunez*, 91 F.3d 826, 833 (6th Cir. 1996) (an error{**2003 U.S. Dist. LEXIS 47**} affects substantial rights when the error results in a sentence substantially different than that which would have been imposed absent the error). *Page*, 232 F.3d at 544. Applying this conception of the third prong to the facts before it, the panel determined that the lower court's erroneous application of an enhanced penalty range did not affect three of the defendants' substantial rights, as the sentences they received could have been imposed under the baseline statutory penalty ranges. Defendant Page's sentence, however, exceeded the "catchall" sentencing range, and the court vacated his sentence and remanded his case for resentencing. 15 *Id.* at 544-45.

{**2003 U.S. Dist. LEXIS 48**} The Sixth Circuit has repeatedly followed *Page*'s lead in holding that a defendant's substantial rights are affected whenever he is sentenced to a term of imprisonment exceeding that authorized by a jury's verdict. *United States v. Sandlin*, 291 F.3d 875, 880 (6th Cir. 2002) (per curiam); *United States v. Graham*, 275 F.3d 490, 523 (6th Cir. 2001) (citing *United States v. Martinez*, 253 F.3d 251, 255 (6th Cir. 2001); and *Page*, 232 F.3d at 544); *Gibson v. United States*, 271 F.3d 247, 258 (6th Cir. 2001) (citing *Page*, 232 F.3d at 545); *Martinez*, 253 F.3d at 255 (citing *Page*, 232 F.3d at 545); 16 *accord United States v. Stubbs*, 279 F.3d 402, 413 (6th Cir.

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2002) (Boggs, J., dissenting) (citing *Page*, 232 F.3d at 544); *see United States v. Lopez*, 309 F.3d 966, 970 (6th Cir. 2002) (defendant's substantial rights were affected because he received a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) rather than a lesser sentence under § 841(b)(1)(C)); *United States v. Burns*, 298 F.3d 523, 544-45 (6th Cir. 2002){**2003 U.S. Dist. LEXIS 49**} (error did not affect defendant's substantial rights because his sentence was within the baseline statutory maximum); *Stubbs*, 279 F.3d 402, 410 (6th Cir. 2002) (sentencing defendant under 18 U.S.C. § 924(c) when he had been indicted upon and pled guilty to violations of 18 U.S.C. § 924(o) affected his substantial rights) (citing *Page*, 232 F.3d at 544).

{**2003 U.S. Dist. LEXIS 50**} With *Page, Sandlin, Graham, Gibson*, and *Martinez* (as well as *Lopez, Burns* and *Stubbs*), the Sixth Circuit has repeatedly expressed the view that a defendant's substantial rights are affected whenever his sentence is increased as a result of an *Apprendi* violation. On at least three occasions, however, the Sixth Circuit has expressed a conflicting view of the third prong. *See Stewart*, 306 F.3d at 323 ("[A] court reviewing a defendant's sentence in which it finds an *Apprendi* error must look to whether the 'omitted element is supported by uncontroverted evidence,' and also 'ask[] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" (quoting *Candelario*, 240 F.3d at 1308) (second alteration in original)); *United States v. King*, 272 F.3d 366, 378-80 (6th Cir. 2001) (defendants' substantial rights not effected by *Apprendi* error that occurred during sentencing because evidence was uncontroverted and neither defendant objected to manner by which drug quantity determinations were made); *United States v. Stafford*, 258 F.3d 465, 476-78 (6th Cir. 2001){**2003 U.S. Dist. LEXIS 51**} (defendant's factual admission of drug type and quantity obviates any *Apprendi* concerns).

In the first of these cases, *United States v. Stafford*, the defendant was charged with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The indictment did not specify drug quantities. The defendant pled guilty to the charge, and his plea agreement stated that the charged offense carried a term of imprisonment between 10 years and life and that the Government would stipulate to drug quantity of "235.42 grams cocaine-base and 14.48 grams powder cocaine." *Stafford*, 258 F.3d at 468 (quoting Plea Agreement at 3-4). At Stafford's change of plea hearing, both prosecutor, defense attorney, and the defendant himself agreed that he was subject to a ten year mandatory minimum, and the judge informed the defendant that he faced a maximum term of life imprisonment. In his plea colloquy, Mr. Stafford admitted to possessing approximately 241 grams of cocaine base and 14 grams of powder cocaine. *Id.* at 469 (quoting Plea Hearing Tr. at 5). The Presentence Investigation Report ("PSR") stated drug quantity at 235.42{**2003 U.S. Dist. LEXIS 52**} grams of cocaine base and 14.48 grams of powder cocaine, cited the statutory penalty provision of 21 U.S.C. § 841(b)(1)(A), and observed that it called for a term of imprisonment between ten years and life. *Id.* at 469-70 (citing PSR at 1, 18). Defendant did not object to the PSR. *Id.* at 470.

On appeal, Stafford raised an *Apprendi*-based objection, arguing that the drug quantity should have been determined by the jury beyond a reasonable doubt and that the indictment did not survive scrutiny because it was silent as to drug type or quantity. The Sixth Circuit rejected defendant's first argument, reasoning that the "heightened [reasonable doubt] standard of proof would not have altered the sentencing court's resolution of this uncontested factual issue." *Id.* at 476. With regard to Stafford's second argument, the court held that "any alleged defect in the indictment did not affect Defendant's substantial rights" because he had admitted to the quantity of drugs in the plea agreement, had repeatedly been advised of the applicable enhanced sentencing range, and had not been sentenced above the statutory maximum{**2003 U.S. Dist. LEXIS 53**} term for the "catchall" provision, 21 U.S.C. § 841(b)(1)(C), which does not require the government to establish drug quantity. *Id.* at 478. The court also determined that there had been no reversible plain error because

3yfcases

11

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the defendant was not sentenced beyond the maximum term set forth in § 841(b)(1)(C). *Id.* at 479 & n.9; *see also id.* at 483 (Clay, J., concurring).

The Sixth Circuit again had the opportunity to revisit the "substantial rights" prong in *United States v. King.* There, two co-defendants argued on appeal that the drug quantity upon which their sentences were based should have been alleged in the indictment and determined by the jury. Both defendants received sentences within their respective "catchall" sentencing ranges, but both had been sentenced under enhancement schemes that increased the mandatory minimum sentence. 17 Applying the plain error test, the court rejected defendants' *Apprendi* objections on the third prong:

> We conclude that the substantial rights of the defendants were not affected by any *Apprendi* error which may have occurred during sentencing. Both defendants{2003 U.S. Dist. LEXIS 54} failed to object to the drug quantity determinations contained in the PSRs despite being on notice that such determinations would affect the length of their sentences. Indeed, King merely objected that the amount in question was closer to 300 grams of actual methamphetamine rather than one kilogram. Moreover, it was the undisputed testimony of a forensic chemist that one package contained 82.8 grams of actual methamphetamine, an amount above the 50 gram amount needed to trigger the defendants' sentences under the applicable statutes. *See* 21 U.S.C. § 841(b)(1)(A). We therefore conclude that any errors in sentencing failed to affect the defendants' substantial rights. *Id.* at 379-80.

Finally, in *Stewart* (the facts{2003 U.S. Dist. LEXIS 55} of which are discussed *supra*), a panel of the Sixth Circuit held that a defendant's substantial rights were unaffected when the record provided no basis for a jury to rationally reach a contrary finding with respect to the "element" that was omitted from the indictment and not submitted to the jury. *Stewart*, 306 F.3d at 323 (citing *Neder*, 527 U.S. at 19; *King*, 272 F.3d at 378; and *Candelario*, 240 F.3d at 1308). 18 Applying this standard to the situation before it, the court found the contrary evidence insufficient to justify reversal. As to co-defendant Nathan Benford, the panel determined that he had failed to challenge the drug quantity assessment and that no evidence called the assessment into doubt. *Id.* at 324-25. Over one dissent, the panel also determined that Rena Benford's sentencing error was also harmless, since the same evidence used against Mr. Benford also applied to her and four separate instances supported the judge's the quantity determination as to her. *Id.* at 332-34. *Contra id.* at 325-26 (Clay, J., dissenting).

{2003 U.S. Dist. LEXIS 56} Although *Stafford* might arguably be distinguishable because it involved a defendant's admission of quantity and also rested on the belief that no *Apprendi* violation had occurred, neither *King* nor *Stewart* are significantly different from the *Page* line of cases to justify the difference in perspective. Further, while all the cases except *Stewart* inquired as to plain, not harmless, error, the analyses of "substantial rights" for both tests are indistinguishable. *See United States v. Olano*, 507 U.S. 725, 734-35, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993); *King*, 272 F.3d at 378; *United States v. Segines*, 17 F.3d 847, 851 (6th Cir. 1994). The two lines of cases simply cannot be reconciled.

Because of this irreconcilable conflict between *Page*'s view of "substantial rights" in *Apprendi* cases and the view espoused by *Stafford, King,* and *Stewart,* the previously-decided *Page* decision controls. *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (2001) (citing *Sowards v. Loudon County, Tenn.*, 203 F.3d 426, 431 n.1 (6th Cir. 2000); and *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 180 F.3d 758, 765 (6th Cir. 1999),{2003 U.S. Dist. LEXIS 57} *rev'd on other grounds*, 531 U.S. 288, 148 L. Ed. 2d 807, 121 S. Ct. 924 (2001)). Thus, an *Apprendi* error arising from the indictment affects a defendant's substantial rights any time the defendant receives a sentence not authorized by the indictment, regardless of the strength of the evidence presented upon the omitted

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

penalty enhancer. While such errors often will be uncorrectable under plain error review, *see Cotton, supra,* they cannot be considered harmless. 19 Accordingly, sentencing Mr. Pennington to death in the current case would be improper even were the Court to apply harmless error review.

{2003 U.S. Dist. LEXIS 58} In addition to being the result dictated by this Circuit's rule of precedent, adoption of the *Page* rule makes better sense. Where the *Apprendi* quasi-elements are omitted from an indictment, the sentencing error is one of wholly unjustified term, not merely one of an unjustified means of reaching a justified term. 20 In other words, even if a jury determines the statutory mental state and aggravating factors beyond a reasonable doubt, the error maintains -- as the error is the exposure to enhanced sentencing itself, not the mere method of exposure. Accordingly, if the error arises in imposing a sentence unjustified by the indictment under any circumstances (whether the factual prerequisite is found by a jury beyond a reasonable doubt of a judge by a preponderance of the evidence), it is nonsensical to argue that the error could not have contributed to the verdict obtained. But for the error, the sentence necessarily would have been within the lower statutory range.

{2003 U.S. Dist. LEXIS 59} It is therefore incongruous to first hold that an *Apprendi* violation lies only in sentencing and not in the indictment, and then hold that the sentencing error (one of unjustified term) is harmless when the evidence justifying the unauthorized increased term is overwhelming. The error *ipso facto* is harmful, and the *Stafford- King- Stewart* framing of the "substantial rights" review is inappropriate. 21

The tortuous and problematic effort of making this harmless error analysis is obvious. As noted in *Stewart,* 306 F.3d at 310, the{2003 U.S. Dist. LEXIS 60} constitutional error does not lie with indictment itself. Instead, the error occurs at sentencing, which has not happened at this time. Consequently, the preemptive analysis is difficult and probably inappropriate considering the procedural timeline of this case.

## CONCLUSION

This case is procedurally unique. It may be factually and procedurally one-of-a-kind. After several hearings, Defendant pled guilty to the charges in the indictment and the Court accepted that plea. All agree that jeopardy attached to the indictment, for which the Defendant stands convicted.

The Court finds that *Ring, Jones* and *Apprendi* compel the conclusion that in a federal capital case, the grand jury must find the FDPA intent and aggravating factors upon which the death penalty is requested and must set forth those findings in the indictment. This is because the mental intent findings and aggravating factors "operate as 'the functional equivalent of an element of a greater offense.'" *Ring,* 122 S. Ct. at 2443 (quoting *Apprendi,* 530 U.S. at 494 n.19). Accordingly, these "functional equivalents of elements" must be charged in the indictment to satisfy the Defendant's{2003 U.S. Dist. LEXIS 61} Fifth Amendment rights.

The Court has agonized over this conclusion for several months. In one sense, there is a common sense analysis that says "let a jury" decide beyond a reasonable doubt whether the Defendant should received the death penalty. After all, the Government did comply with FDPA as understood prior to *Ring.* Before the plea was accepted, the death notice was provided to Defendant, and Defendant was given an opportunity to withdraw his plea of guilty. Consequently, prior to his plea, he had notice from the Government as to the factors it considered mandated the death penalty. All of these facts make the procedural posture of this case unparalleled.

Nevertheless, the Fifth Amendment provides in part, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." This protection applies to the guilty and the innocent, and to those deserving of a second chance and to those who

3yfcases                                    **13**

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

arguably have forfeited that opportunity. It applies to all.

The Defendant was given ninety days after the filing of the death notice to withdraw his offer of a plea before the Court accepted it. The Government had the same{2003 U.S. Dist. LEXIS 62} time to file a superseding indictment and cure flaws in its original indictment. Most likely, neither party considered the profound implications of *Ring*.

A district court does not have the option of following its personal preference in the face of existing precedent. If so, the decision in this case may have been different. Instead, district courts have the duty to following existing law.

At the same time, the law does not exist in a vacuum. The Court recognizes all rulings affect individuals and have a real life impact. No effort by the Court can heal the pain to the victim's family. This ruling places Mr. Pennington in prison for the rest of his life. Probably to the disappointment of the victim's family, it does not allow a jury to determine whether the Defendant should receive the death penalty. The Court must follow what appears to it to be existing law.

The Defendant was entitled to have a grand jury make a finding through an indictment of the aggravating factors and mental intent set forth in the FDPA. Under the singular circumstances of this case, the Court must conclude that the Fifth Amendment prohibits further capital proceedings.

This is the 19 day of February, {2003 U.S. Dist. LEXIS 63} 2003.

Thomas B. Russell, Judge

United States District Court

## ORDER

This matter having come before the Court on motions of the Defendant to preclude imposition of the death penalty (Dkt. Nos. 175 & 198), the Court having received substantial additional briefing regarding the same (*see* Dkt. Nos. 193, 195, 197, 203-04, 208-09, 211-12, 228-29, & 232-33), and otherwise being sufficiently advised,

## IT IS ORDERED:

The motions (Dkt. Nos. 175 & 198) are **GRANTED**. The Government is prohibited from seeking the death penalty against Defendant, and the Court hereby **STRIKES** the Government's Notice of Intent to Seek the Death Penalty (Dkt. # 42).

This is the 19 day of February, 2003.

Thomas B. Russell, Judge

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

# APPENDIX D

UNITED STATES v. BILLIE J. ALLEN                    No. 4:97CR141 ERW (TCM)

INSTRUCTION NO. 20·

## FIREARMS - CRIME OF VIOLENCE/ WHICH RESULTS IN A MURDER

The crime of using or carrying a firearm during and in relation to a crime of violence which results in a murder, as charged in Count II of the indictment has four essential elements, which are:

*One*, the defendant committed the crime of bank robbery as charged in Count I;

*Two*, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm;

*Three*, that in the course of committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, caused the death of Richard Heflin by the use of a firearm; and

*Four*, the killing of Richard Heflin was murder.

Murder is the unlawful killing of a human being with malice aforethought.

"Malice aforethought" means an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life, but "malice aforethought" does not necessarily imply any ill will, spite or hatred towards the individual killed. "Malice," as the term is used here, is but another name for a certain state or condition of a person's mind or heart. Since no one can look into the heart or mind of another, the only means of determining whether or not malice existed at the time of a killing is by inference drawn from the surrounding facts and circumstances, as shown by the evidence in the case.

In determining whether Richard Heflin was unlawfully killed with malice aforethought, the jury should consider all the facts and circumstances preceding, surrounding and following the killing, as shown by the evidence in the case, which tend to shed light upon the condition of mind and heart of the killer, before and at the time of the deed. No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the question of malice aforethought

353

should escape careful consideration by the jury.

The phrase "used a firearm" means that the firearm was actively employed in the course of the commission of the bank robbery. You may find that a firearm was used during the commission of the bank robbery if you find that it was brandished, displayed, or fired.

For you to find the defendant guilty of the crime charged under Count II, the government must prove all of these essential elements beyond a reasonable doubt otherwise you must find the defendant not guilty of this crime under Count II.

8th Circuit Manual of Model Criminal Jury Instructions 6.18.924 [Modified]
Devitt & Blackmar, Federal Jury Practice and Instructions, (3d. Ed. 1977) Section 41.05
Title 18 United States Code, Section 924(c)
Title 18 United States Code, Section 924(j)(1)
Title 18 United States Code, Section 1111

Huen
2/26/98
r. Richard Mehler
A.S.D.J.

354

# APPENDIX E

UNITED STATES V. BILLIE J. ALLEN          No. 4:97CR141ERW(TCM)

INSTRUCTION NO. _22_

## FIREARMS - CRIME OF VIOLENCE

If your verdict under Instruction No. _20_ under Count II is not guilty, or if, after all reasonable efforts, you are unable to reach a verdict on Instruction No._20_, you should record that decision on the verdict form and go on to consider whether the defendant is guilty of the crime of using or carrying a firearm during and in relation to a crime of violence.

The crime of using or carrying a firearm during and in relation to a crime of violence has three essential elements, which are:

*One*, the defendant committed the crime of bank robbery as charged in Count I;

*Two*, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm; and

*Three*, that in the course of committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, caused the death of Richard Heflin by the use of a firearm.

The phrase "used a firearm" means that the firearm was actively employed in the course of the commission of the bank robbery. You may find that a firearm was used during the commission of the bank robbery if you find that it was brandished, displayed, or fired.

For you to find the defendant guilty of the crime of using or carrying a firearm during and in relation to a crime of violence, the government must prove all of these essential elements beyond a reasonable doubt; otherwise, you must find the defendant not guilty of this crime.

359

8th Circuit Manual of Model Criminal Jury Instructions 3.10, 6.18.924[Modified]
Devitt & Blackmar, Federal Jury Practice and Instructions. (3d Ed. 1977) §41.05
Title 18 United States Code, Section 924(c)
Title 18 United States Code, Sections 924(j)(1); (J)(2)

*Hueen*

*2/26/98*

*S. Arhand Mitth*

*A.S.P.J.*

360

# APPENDIX F

UNITED STATES v. BILLIE J. ALLEN                    No. 4:97CR141 ERW (TCM)

INSTRUCTION NO. __25__

The phrase "carries a firearm" means to bear the firearm on or about the person so long

as it is located in such proximity to the person as to be convenient of access and within reach.

The government is not required to show that the defendant actually displayed or fired the firearm.

United States v. White, 81 F.3d 80, 83 (8th Cir. 1996); 36.20 Devitt, Blackmar and O'Malley
[Modified]; United States v. Anderson, 881 F.2d 1128, 1140-41 (D.C. Cir. 1989) and Fifth
Circuit Model Instructions, Section 2.45

*Hereen*

*2/26/98*

*E. Richard Webber*

*U.S.D.J.*

361

# APPENDIX G

LABORATORY REPORT

RE: Richard HEFLIN, JR.
204 Sandra Dr.        :VICTIM

Norris HOLDER
5607 Curry            :SUSPECTS

Billy ALLEN

FATAL SHOOTING,
3-17-97

COMPLAINT NO.:   97-3 4 2 8 4

REQUEST REC'D:   3-18-97

REPORT DATE:     6-5-97

LABORATORY NO.:  7 0 3 3 6 0

EXAMINER:        DONNA BECHERER

EXAMINED FOR:    Homicide Section
Det. Toretta
U.S. Attorney
Joe Landolt

REPORT

SPECIMENS:

Q-4.    Blood from white strap
K-1.    Blood of Richard Heflin, Jr.
K-2.    Blood of Billie Allen

RESULTS OF EXAMINATION:

Deoxyribonucleic acid (DNA) profiles from genetic loci D1S7, D2S44, D4S139, D5S110, D10S28 and D17S79 were developed from HaeIII-digested high molecular weight DNA extracted from the above-listed specimens. Based on these results, the DNA detected in the Q-4 white strap stain does not match the DNA of Richard Heflin or Billie Allen, and could not have been contributed by either of these individuals.

CHAIN OF CUSTODY

| Priest Q-4 | to | Vincent 3-17-97 | to | Owens 3-17-97 | to | Becherer 3-21-97 |
|---|---|---|---|---|---|---|

| Graham K-1 | to | Barry 3-18-97 | to | Karr 3-18-97 | to | Owens 3-18-97 | to | Becherer 3-21-97 |
|---|---|---|---|---|---|---|---|---|

| Crow K-2 | 3-18-97 | to | | Becherer 3-21-97 |
|---|---|---|---|---|

EXAMINER: _____
Donna Becherer
Criminalist

EXAMINER: _____
Kim Gofman
Criminalist

eas



0001266

# APPENDIX H

METROPOLITAN POLICE DEPARTMENT - CITY OF ST. LOUIS

LABORATORY REPORT

RE:  Richard HEFLIN
     6900 Clayton          :VICTIM

     Norris HOLDER
     5607 Curry            :SUSPECT

     Billy ALLEN
     3164 Oregon           :SUSPECT

     HOMICIDE/BANK ROBBERY,
     3-17-97

COMPLAINT NO.:  97-3 4 2 8 4

DATE RECEIVED:  3-17/3-18 & 3-19-97

DATE EXAMINED:  4-3-97

LABORATORY NO.:  7 0 3 3 6 0

EXAMINER:  JOSEPH STEVENS

EXAMINED FOR:  Homicide Section
               Det. Nickerson

REPORT

SPECIMENS:

52A

Q-1. Metal can containing one damp rag.
Q-2. One metal can containing carpet and debris from behind passenger
     seat of van. 52B
Q-3. Paper evidence bag containing clothing of suspect Allen consisting
     of:  a) gray sweatpants, b) blue sweatpants, c) black, red and
     white pullover shirt.
Q-4. Paper evidence bag containing clothing of suspect Norris
     consisting of:  a) blue coveralls, b) blue and red "Nautica"
     shirt, c) blue jeans, d) white "bullet proof" vest.
Q-5. Paper evidence bag containing one black leather jacket recovered
     from front seat of vehicle.
Q-6. Paper evidence bag containing plastic bag containing one pair of
     very wet leather gloves.

RESULTS OF EXAMINATION:

Q-1. Gas chromatographic analysis of the head space of Specimen Q-1

     failed to disclose the presence of any petroleum distillates.

Q-2. Gas chromatographic analysis of the head space of Specimen Q-2

     disclosed the presence of gasoline.

Q-3 through Q-6.  Specimens Q-3 through Q-6 were repackaged by heat

     sealing in Kapak bags.

     Subsequent gas chromatographic analysis of the head spaces inside

     these Kapak bags disclosed the following:

     Q-3.  No petroleum distillates were detected.

     Q-4.  Gasoline detected

     Q-5.  Gasoline detected

     Q-6.  Gasoline detected

0000157

Page 1 of 2 Pages

# APPENDIX I

# METROPOLITAN POLICE DEPARTMENT - CITY OF ST. LOUIS
## EVIDENCE TECHNICIANS REPORT

FILE NO. FOR RECORDS DIVISION

COMPLAINT NO. 97-34395

CONCERNING _Homicide_
TYPE OF ORIGINAL REPORT

ORIGINAL C.N. 97-34284

DIVISION REPORTING 452

DATE OF THIS REPORT 3-17-97

DATE AND TIME OF OCCURRENCE 3-17-97

PLACE OF OCCURRENCE 6900 Clayton

DISTRICT 2

LOCATION CODE

VICTIM _Richard Hefflin_

HOME ADDRESS

BUSINESS ADDRESS

REQUESTING OFFICER _Nickerson_  DSN 0944  ASSIGNMENT 421

REQUESTING CAR 4203

TIME RECEIVED CALL 1330

TIME OF ARRIVAL 1350

TIME COMPLETED 1800

RESPONDING OFFICER(S) DSN
A. _Thomas A. Schulze_ 2395
B. _John Logan_ 6032

DSN

RESPONDING UNIT

LATENT PRINT EXAMINATION (X) YES ( ) NO  IF YES, CHECK RESULTS: (X) POS. ( ) NEG.

| NEGS. | LIFTS. | LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|---|---|
| | A1 | Driver Door | 6032 |
| | B | Driver Door | 6032 |
| | | | |
| | C | Inside Rearview Mirror | 6032 |
| | | | |
| | | Veh: Blue 1989 Dodge Station Wagon | |
| | | Mo Lic: F7R-237 | |
| | | Ser # 1B4K5437KX423600 | |

PHYSICAL EVIDENCE SEARCH (X) YES ( ) NO  EVIDENCE SEIZED (X) YES ( ) NO

| DESCRIPTION OF EVIDENCE & LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|
| (1) Winchester Defender 12 Pump Action Shotgun - under Center Assembly of | 2395 |
| (8) Live Rounds 12g Shotgun - in shotgun - Latent Fingerprint Processing | |
| (1) Damp rag-found on Drivers Seat of Vehicle - DNA Testing | |
| (7) Cassette Tapes (1) Auto Light (1) Soda Can (1) Soda Cup (1) Auto Book | |
| Cup Holder (1) Piece of Steering Column (1) Piece of Plastic - Floor Board | |
| of Vehicle. Items To Be Processed For Latent Prints. | |

PHOTOGRAPHY (X) YES ( ) NO

| NEGS. | DESCRIPTION & LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|---|
| 18 | of Vehicle - Inside and out of Vehicle gauge | 2395 |
| | | 6032 |

PHOTO EVIDENCE TO I.D. BY: 6032

LATENT EVIDENCE TO I.D. BY: 6032

PHYSICAL EVIDENCE TO LAB BY: 2395

TECHNICIAN REPORTING _Thomas A. Schulze_  DSN 2395

SUPERVISOR APPROVING _Joseph Burns_  DSN 6018

0000524

PAGE 1 OF 1

# APPENDIX J

91A-SL-181120
SDK/pmw
1

On Monday, March 17, 1997, an anonymous telephone call was received at the St. Louis office of the Federal Bureau of Investigation.  The caller, a black male, advised that he had seen the television news concerning the arrest of Norris Holder in connection with a bank robbery at the Lindell Bank and Trust. The caller advised that he had seen Holder at the North Oaks Bowling Alley in Normandy.  Approximately one week prior, the caller had seen Holder at the bowling alley and heard him talking to an individual known as ▓▓▓▓ about robbing a bank.  The caller advised that both Holder and ▓▓▓▓ frequent the bowling alley.

D.M.

On March 17, 1997, Special Agents (SAs) Stephen D. Kettner and Michael A. Vick responded to North Oaks Bowl, 101 North Oaks Plaza, near the intersection of Lucas and Hunt and Natural Bridge Roads.  Inquiry in the cocktail lounge and at the billiards center disclosed that ▓▓▓▓▓▓▓▓▓▓ frequents the bowling alley and has been seen in the company of several black males.

The following individuals were particularly helpful and offered to assist in the investigation as necessary:

R.M.

Security Guard ▓▓▓▓▓▓ is a Police Officer at ▓▓▓▓ ▓▓▓▓▓▓, working secondary employment in uniform at North Oaks Bowl.  ▓▓▓▓ can be contacted at the ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

T.B.

Police Officer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Department, was off-duty in the cocktail lounge.  ▓▓▓▓▓▓▓ advised that he frequents the cocktail lounge, had seen ▓▓▓▓ there and would attempt to identify any associates seen with ▓▓▓▓.  ▓▓▓▓ can be contacted at the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(w) 084pmw02.ins

0000671

# APPENDIX K

91A-SL-181120
JRH:aep

1

        The following is a transcript of radio traffic between St. Louis Police Department officers and dispatch re investigation and arrest of subjects on March 17, 1997.

| | |
|---|---|
| U/M: | Yeah, I have an emergency call (?), I'll go over to Euclid by the Metrolink, the subject might be heading over there.  They talked to him; they said his van caught on fire, and he was heading for the Metrolink on Euclid Avenue.  And advise the Metrolink officers check the Metrolink trains uh (UI). |
| Dispatcher: any | That's clear.  9912 be advised I don't have cars in service in the 9th. |
| U/M: | Go on 26, he's up here, and he's heading down to Metrolink.  I'm heading down there now. |
| U/F: | Clear 924. |
| Dispatcher: | Clear 924. |
| U/F: | Be advised that I'm 72 at the Metrolink right now, and uh I don't see any subject matching the description. |
| Dispatcher: | 6248 |
| U/M: | We've got information from workers that they caught the guy he's said his van caught on fire and he's heading towards the Metrolink supposedly on Euclid Avenue.  He could've went anywhere though. |
| U/F: | Wearing gray sweatpants and possibly a multi-colored plaid shirt. |
| Dispatcher: | Clear. |
| U/M: | Dispatcher ask the woman.... |
| U/F: | Be advised the super....... |

174AEP08.OTH(W)

0000661

91A-SL-181120
JRH:aep

2

| U/M: | 525 |
|---|---|
| U/M; | It's right across the street, the highway following the subject west of the yard here. |
| Dispatcher: Second | That's clear, all.... Attention all cars. subject wanted for the robbery and assault 1st from, 6900 Clayton, be advised the subject is a black male.   Attention all cars be advised the subject wanted for the bank robbery.  Supposedly, he's on North Euclid at this time going towards the Metrolink.  His van caught on fire and is disabled.  Time is 11:04. |
| U/M: | 6207 |
| Dispatcher: | 1911 |
| U/M: | 911 |
| Dispatcher: | Do you have description of him? |
| #911: | The only thing I was told Dispatcher is a black male with a plaid or multi-colored shirt.  And he was last seen up around the area directly across from the old uh.... |
| U/M: | 912 |
| Dispatcher: | Across from where? |
| #911: | From the arena inside the fence area at the uh City uh Parks Division, on the uh north side of Highway 40 there. |
| Dispatcher: | That's clear, go ahead 912. |
| #912: | Clear, uh where you guys; I got Officer Zuick (phonetic) with me, he talked to one of the workers up there.  This uh subject supposedly talked to the guards, and his van caught on fire, and he going to ask for the closest Metrolink station, and he headed that direction.  Now, he is a black male with a uh gray sweatpants and a multi-colored plaid shirt; is all we have right now.  And, that's |

0000662

91A-SL-181120
JRH:aep

3

where the information comes from Officer Zuick.

(Asks Officer Zuick) What car are you in?

Zuick:           226

#912:            He's in car 226.  I have him in my car now.

Dispatcher:      That's clear.  And 912 relative.

U/M:             912

Dispatcher: uh   For the location that 911 is gonna be correct he's headed toward the Metrolink right there across uh from the old city arena.

U/M:             I don't know Dispatcher, this (UI)....... we got.  So why don't you advise second district where we got it from and Officer Zuick when we talked to see uh workers.  He crawled underneath the fence, and his van caught on fire.  And he started to ask for the closest Metrolink station; that's where he headed towards.

Dispatcher:      That's whe...

U/M:             Just advise the uh second (UI) that's where we got the information from.  I got Officers Zuick and 226 is with me.

Dispatcher:      That's clear.  I'm aware of that.  I'm just trying to find out where was he at exactly when he talked with the guards, the address...

U/M:             He was in that yard at 6900 Clayton, and he talked to the not the he talked to one of the workers when he, he saw him crawling underneath the fence, and he asked which way was the closest Metrolink station.  That's where we got the information from.  And, we don't know if he went that way, but that what he asked and that's the way he headed.

Dispatcher:      That's clear.  I'll give this to the Second

00C0662

91A-SL-181120
JRH:aep

4

District, 6900 Clayton.

U/M: Yeah, workers at that compound there told Officer Zuick that so we're in the area and that's where the information came from.

Dispatcher: Right, that's clear, I'm aware of that. I'm
just getting ready to put it out so the Detectives and all the cars will know the last information.

Attention all cars. Relative to the bank robbery subject, from 1226 received information from a guard in the 5900 block of Clayton that the subject was last seen crawling under a fence; he asked where's the nearest Metrolink. He's a black male, having on a gray sweatsuit, a multi-colored, gray pants, sweatpants and having on a multi-colored jacket. This is from 912, time is 1107.

U/M: 923

Dispatcher: 923

#923: You can make the last 95 and I'll be by...

Dispatcher: Cars 95 at 1108 in the area of the Metrolink.

U/M: Gonna be by the Metro..

U/F: Attention all cars. From 1500 this subject will also have a injured right hand and some hair that was singed. That black male wanted for the shooting at the bank, 1108.

U/M: 223 - I'm here by the Metrolink on Scott.

U/F: .....1500, he has information from a witness stating this black male in the gray sweatpants and multi-colored jacket will have an injured right hand and singed hair, at 1108.

Dispatcher: 923 I'm clear that you'll be by the Metrolink

0000664

91A-SL-181120
JRH:aep

5

| | |
|---|---|
| on | Scott, at 1109.  926 go ahead. |
| U/M: | 26 I'm gonna on be on foot in the planetarium. |
| U/M: | 6227 |
| Dispatcher: | 926 I show you on foot in the planetarium area at uh... |
| | Attention all cars.  Additional information on the suspect still at large relative to the bank robbery and also a sub first.  The black male subject wearing a multi-colored jacket, gray sweatpants, be advised from 6123 the subject was possibly wearing a full body armor suit.  That's a full body armor suit, possibly has an injury on the right hand from the vehicle fire.  1109's the time. |
| Dispatcher: last | 6227 you were cut out, could you repeat your please. |
| U/F: | .......gray sweatpants, multi-colored jacket.... |
| #6227: | We were advised by a jogger right by Steinberg lane that....... |
| U/F: | ........a fence, uh witnesses say he was on fire at the time. |
| Dispatcher: advised | Go ahead, you were just cut out, you were by a jogger by Steinberg's Skating Rink. |
| U/M: | 724, what's his exact location? |
| U/F: | That's uh Euclid Metrolink Station. |
| Dispatcher: | 6227 |
| U/M: | 6348, there's plenty help. |
| Dispatcher: | 6227 |
| #6227: | 27 |

00C0685

91A-SL-181120
JRH:aep

6

| Dispatcher:<br>uh as | Be advised your transmission cut out as you, soon as started to speak about the jogger, by Steinberg informed you of what? |
| --- | --- |
| #6227: | Subject matching that description heading north and east like up towards Kingshighway from the bike path. |
| Dispatcher:<br>informed by | Attention all cars.  From 6227 he was a jogger inside of Forest Park by the Steinberg's Skating Rink that that subject fitting that description was last seen going north and east towards the bike path towards Kingshighway.  Attention all cars from 6227 he was advised by a jogger by Steinberg's Skating Rink that that subject fitting the description was last seen going north and east towards Kingshighway towards the bikepath.  Time is 1112. |

And all cars and the clothing on that suspect
is black male, blue correction gray
sweatpants, a multi-colored jacket, he
possibly has a right hand injury, singed
hair.

(RECORDING - THIS CONCLUDES THE TAPE)

0000666

# APPENDIX L

*Alibi*

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog___ , On _02/02/1998_ , Page ___19___

Shegog:        Uh...east St. Louis.

Swenson:       East St. Louis?

Shegog:        Yeah.

Swenson:       You recall what time you left home that day?

Shegog:        I leave...say about...about nine-thirty, something like that... yeah about nine-thirty.

Swenson:       Did ya, did ya have any other stops before you went?

Shegog:        Uhhhhh.....no.  Nope.

Swenson:       Had, had you been at the mall awile before you saw him?

Shegog:        I walked in, when I walked in he was with a group there, right there.

Swenson:       Okay, but it doesn't take you that long if you left your, your house at nine-thirty, it doesn't take you that long to drive over to Northwest Plaza though does it?

Shegog:        It takes me about thirty, forty, thirty, forty minutes, depends on, ya know, where you staying in St. Louis.

Swenson:       Right.  So you think it takes about forty

0002192

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog___, on __02/02/1998__, Page ___20___

|  | minutes or so from your house, thirty to forty minutes?  Okay.  But you don't think there's anyway you saw him before eleven? |
|---|---|
| Shegog: | Uh hmmm, uh hmmm. |
| Swenson: | When you left you went to, you drove him to his girlfriend's house somewhere off of Bermuda. |
| Shegog: | Uh hmmm. |
| Swenson: | How close to the highway was that? |
| Shegog: | Right off the highway. |
| Swenson: | Right off the highway.  You recall her name? |
| Shegog: | He didn't never tell me her name. |
| Swenson: | Never told ya?  Okay, so you... |
| Shegog: | He uh, I guess he had two girlfriends, I don't know, there was one at Bermuda ...(UI)...and the one...the house he was over with. |
| Swenson: | Oh, okay. |
| Shegog: | So, I know they weren't the same girl. |
| Swenson: | Had, had you met these girls before.  Did you know anything about them? |
| Shegog: | I hadn't seen Billy in a long time. |

0002193

FD-302a (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog___ , On __02/02/1998__ , Page ___21___

Swenson:           You weren't really close enough to Billy that you know, to know that kind of stuff about him.

Shegog:            The only dealings I had with him was with his sister that was it.

Swenson:           Okay.  When you uh, when you dropped him off at his sister's house or his girlfriend's house, you waited in the car.  How, earlier you said about fifteen minutes?  Is that?

Shegog:            He went in about five, five.

Swenson:           Five minutes, okay, I'm sorry you said about fifteen minutes about your, your check, okay.  Uh, you say about five minutes, you think?

Shegog:            Five to ten, yeah.

Swenson:           Okay, did he take anything in?  Did he bring anything out?

Shegog:            He said he had to drop some money off to her.

Swenson:           Said he had to drop some money off?

Shegog:            Uh hmmm.

Swenson:           Okay.  Did he buy anything in Northwest Plaza that you saw.  Did he have any bags or...?

Shegog:            He had some bags, uh huh, not sure what kinda

0002194

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog_, On _02/02/1998_, Page ___22___

|  | bags they was, uh, but he had like two or three. It was large bags. |
|---|---|
| Swenson: | Okay. |
| Shegog: | Uh...that's, I remembered it then, when I went to St. Clair Square he bought uh...two, some more clothes out of there. |
| Swenson: | Okay. |
| Shegog: | Ya know, 'cause I thought maybe he just, ya know, dirty money...(laughing)...it was dirty money, ya know, I was saying... |
| Swenson: | Diff...different kind maybe? |
| Shegog: | Yeah. |
| Swenson: | So he had, he had two or three bags with him when he left, when you first saw him at the mall? |
| Shegog: | Uh hmmm. |
| Swenson: | At Northwest Plaza? |
| Shegog: | Shoes...shoe bags. |
| Swenson: | Shoe bags. |
| Shegog: | Yeah, shoe bags, some kind of clothes bag. |
| Swenson: | But he didn't really discuss with you what he bought? |

0002195

# APPENDIX M

*Sindel, Sindel & Noble, P.C.*

ATTORNEYS & COUNSELORS AT LAW

8000 MARYLAND AVE. - SUITE 350

CLAYTON, MISSOURI 63105

RICHARD H. SINDEL
CHARLES D. SINDEL
TRAVIS L. NOBLE, JR.

STEPHANIE HOWLETT
KATHRYN B. PARISH
JOSHUA C. SINDEL
DANIEL J. NOLAN

(314) 721-6040
FAX (314) 721-8545
www.sindellaw.com

WILLIAM F. SINDEL
1933-1991

TEBBS P. FORGEY, JR.
1936-1967

RICHARD H. SINDEL
cell (314) 799-7045
rsindel@sindellaw.com

September 9, 2014

Billie Allen#26901-044
USP Terre Haute
PO 33
Terre Haute, IN 47808

**LEGAL MAIL**
**ATTORNEY-CLIENT**
**PRIVILEGE**

Re:   Billie Jerome Allen v. United States
       Cause No: 4:07-CV-27-ERW

Dear Billie:

I have received your most recent letter concerning the questions that you would like me to answer. Unfortunately, I do not believe that it would be appropriate for me to correspond with you as long as you are represented by an attorney. I have sent a copy of the letter to your attorney with what I anticipate my answers would have been.

Good luck to you.

Very truly yours,

Richard H. Sindel

RHS:dd



SINDEL, SINDEL & NOBLE

Exhibit 2

## Sindel, Sindel & Noble, P.C.

ATTORNEYS & COUNSELORS AT LAW

8000 MARYLAND AVE. - SUITE 350

CLAYTON, MISSOURI 63105

(314) 721-6040

FAX (314) 721-8545

www.sindellaw.com

RICHARD H. SINDEL
CHARLES D. SINDEL
TRAVIS L. NOBLE, JR.

STEPHANIE HOWLETT
KATHRYN B. PARISH
JOSHUA C. SINDEL
DANIEL J. NOLAN

WILLIAM F. SINDEL
1933-1991

TEBBS P. FORGEY, JR.
1936-1967

RICHARD H. SINDEL
cell (314) 799-7045
rsindel@sindellaw.com

July 21, 2014


Timothy Kane
Assistant Federal Defender
*sent via email: timothy_kane@fd.org*

In Re:  Billie Allen

Dear Tim:

Attached is the letter Billie sent me.  I have not sent him answers to the questions, but if I had. they would have been:

1.   Yes
2.   Yes
3.   Yes
4.   Yes
5.   I do not understand the question
6.   Yes.

Please call with any questions.

Very truly yours,



Richard H. Sindel.


RHS:dd
Attachment

Exhibit 2                                                    7/1/14

Mr. Sindel,

How are you? I'm sure that this letter must come as a surprise, but I'm reaching out to you personally because I need your help.

I'm not sure if you've been keeping up with my case, but just this week, the Court turned down my appeal; putting me one more step closer to death's door. (A fate that I believe you don't want me to share.)

I'm writing because some facts and evidence in my case have developed / come to my attention and I was wondering if you could tell me if any of the facts and/or evidence would've been used by you or investigated, before or at trial, had you known about them?

As you and I both know, getting a hearing on guilt issues or receiving a new trial is a hard, if

not almost impossible task because of the roadblocks put up by the Courts. But if I can show that you would've done something different, or investigated facts of the case, or evidence, had you known about them at trial; it would better my chances at saving my life with a new trial or hearing.

I'm in no way asking for you to lie for me or say things just to save my life. I only want your true answers to some of the questions I have. I'm also in no way trying to make you look bad; just to save my life. I just want your honest answers and/or opinions...

1) Before and/or during my trial, if you had known that the government discovered traces of DNA at the crime scene, and after testing, the results excluded me and the victim; would you have investigated this evidence further and/or presented the results to my jury to establish reasonable doubt?

2) Before and/or during my trial, if you had known that the government was in possession of recordings

Exhibit 2

of witnesses, who were at the crime scene; would you have wanted those recordings in determining what to present on my behalf and/or to use in cross examining the witnesses; being that witnesses stories would change at trial from what was in their police or F.B.I. 302 forms?

3) Before and/or during my trial, had you known that the government would test my clothes for traces of gasoline, (in hopes of linking me to the crime), but the results would later exclude my clothes for traces of gasoline; would you have investigated this further or presented this to my jury to establish reasonable doubt?

4) Before and/or during my trial, had you known that officers lied about Henderson and I knowing each other from the Marquise murder and evidence could prove the lie; would you have investigated this evidence and/or presented it to impeach the witnesses?

5) Before and/or during my trial, had you known

Exhibit 2

the government planned to use charges in my indictment to establish motive (and other things). and the charges would later be ~~revealed~~ revealed to be done by someone else; would you have investigated these facts, kept them from being heard by my jury, or had them removed from the record. all together?

6) Before and/or during my trial, had you known that someone name Jerry Bostic or (JB) could be linked to the DNA found at the crime scenes and that he had possible links to the planning and possibly the crime; would you have investigated him and/or presented him as a witness, or ask for testing to link him to the crime?

I also plan to ask John the same questions and to hopefully use the answers in my C.O.A. filing. With the evidence that has come to my attention,

I believe that if I'm correct, you would've investigated and presented the things I've mentioned. One can't overlook how strong these things are and how they would've changed a lot!

Thanks for your time and I hope that you can help me by answering these questions.

Take Care,

Billie Allen

26901-044
P.O. BOX 33
Terre Haute, IN,
47808

P.S. Can you make a copy of this letter with your answers?

# APPENDIX N



St. Louis police officer Thomas A. Carroll in a 2014 image. Photo by J.B. Forbes, jforbes@post-dispatch.com

**ST. LOUIS** • Deputy U.S. marshals led a former St. Louis police detective from federal court here in handcuffs Wednesday after he admitted beating a shackled suspect who had been found with the ex-officer's daughter's stolen credit card.

In pleading guilty of a felony charge of depriving someone of his civil rights, Thomas A. Carroll, 52, said he threatened Michael Waller, who was arrested July 22, 2014, at Ballpark Village. Carroll said he attacked Waller at a police station after a boss warned Carroll to stay away.

After Assistant U.S. Attorney Fara Gold described details of the crime, U.S. District Judge Henry Autrey asked Carroll if they were true.

"They're substantially correct," he said.

Carroll disputes prosecutors' claims that he stuck a pistol in Waller's mouth and threatened him. The former officer also denies "obstructive behavior" after the incident, and disputes any claims that Waller was seriously injured. If proved at his sentencing hearing, those factors could add years to a prison term.

Prosecutors think Carroll should face seven to nine years, defense attorney Neil Bruntrager said, but without sentencing enhancements it would be 15 to 21 months. The July 7 sentencing hearing has the potential to turn into a mini-trial, with each side presenting its version of events.

After the hearing, prosecutors declined to comment.

Bruntrager described Carroll as a "highly decorated officer" who "did things the right way."

He said that Carroll's daughter's purse, wallet and ID were among items stolen from her car two days before her wedding.

"It's not an excuse, but it's an explanation," Bruntrager said. "People can't lose sight (that) ... these guys are human."

# APPENDIX O

# The Washington Post

*Democracy Dies in Darkness*

# To win a murder conviction, police and prosecutors made up evidence and secretly paid a witness, St. Louis DA finds

By **Meagan Flynn**

July 26, 2019 at 6:10 a.m. CDT

The state's theory stretched the physical limits of the human body. Somehow on the night of Oct. 30, 1994, Lamar Johnson left his friend's apartment, traveled three miles to Marcus Boyd's front porch with one other man, killed Boyd, fled on foot and arrived back at the apartment to continue socializing with friends — all in "no more than five minutes."

Now, the St. Louis Circuit Attorney's Office says it knows how prosecutors managed to convince a jury it was true: Police and prosecutors made up the evidence, according to a 67-page motion seeking to vacate Johnson's first-degree murder conviction and grant him a new trial after 24 years behind bars.

The accompanying investigative report, made public this week, describes a staggering amount of misconduct on the part of homicide detectives and prosecutors that convicted Johnson and sent him to prison for life with no possibility of parole.

Not only did detectives write police reports containing invented statements from witnesses, the report found, but the St. Louis Circuit Attorney's Office also made secret payments to the single eyewitness, who was pressured into making the false identification that would ultimately seal Johnson's fate, according to the report.

And authorities did all of this, investigators found, in the face of "overwhelming" evidence that Johnson was an innocent man. He has insisted on his innocence the entire time he has been behind bars.

"The violation of Johnson's constitutional rights enabled the State of Missouri to obtain a conviction and sentence of life without the possibility of parole against Johnson despite overwhelming evidence of innocence," the circuit attorney's office wrote. "The undisclosed secret payments to the sole eyewitness in a case that was undeniably thin fatally undermines the reliability of the verdict."

AD

The case is a striking example of how serious misconduct by law enforcement can be brought to the surface by a conviction integrity unit, which progressive district attorney's offices across the country have set up to investigate potential wrongful convictions. In this case, St. Louis Circuit Attorney Kim Gardner created the unit with the help of a federal grant in December and in partnership with the Midwest Innocence Project, which had already been working on Johnson's case since 2008.

In the report, the unit describes the evolution of the police investigation as "a series of circumstances that are alarming and offend the most basic notions of fairness and justice." By contrast, the trial prosecutor, Dwight Warren, who is no longer with the office, described the report as "nonsense," the St. Louis Post-Dispatch reported.

The investigation into Johnson's case found that a single homicide detective, Joseph Nickerson, authored four false police reports describing possible motives for Johnson to kill Boyd, such as that Johnson had a drug beef with Boyd. Years later, all four witnesses would review the reports and swear under oath that they never said what Nickerson attributed to them. The only eyewitness, Greg Elking, failed to identify Johnson several times before pointing to him at trial. He would be paid more than $4,000 for his cooperation — payments not discovered until the CIU's investigation in 2019.

AD

The men actually responsible for killing Boyd in a botched robbery would reveal themselves much sooner. They confessed as early as 1996 and 2002, saying in sworn affidavits that Johnson was not involved. Johnson continued to languish in prison anyway.

"I know Lamar Johnson is innocent of that crime because I was there and Lamar Johnson was not there," the confessed shooter, James Howard, stated 17 years ago.

The homicide investigation seemed poisoned from the start, investigators found. Before police even interviewed the sole eyewitness, police already wrote down the name of a prime suspect: Johnson. The intel appeared based on little more than a hunch from the victim's girlfriend. She had told police she couldn't see the killers' faces: They were wearing ski masks.

AD

Around 9 p.m. the night of the shooting, they had ambushed the porch where Boyd was sitting with Elking, who had come to pay a small drug debt. Presented with a photo array of suspects, Elking told Nickerson he never saw the shooters' faces either. But Nickerson told him that if he cooperated as a witness, the state would help his family financially. Elking agreed.

He did not positively identify Johnson, saying only that his eyes looked "familiar."

In the police report, however, Nickerson wrote that Elking did identify him — a fabrication he used to support an arrest warrant for Johnson, the investigation found.

Immediately after his arrest, Johnson explained his alibi to Nickerson, insisting he was with his girlfriend at their friend's apartment and that there were phone records to prove it. Curiously, a second detective, Ralph Campbell, interviewed Johnson just minutes after Nickerson and claimed in a police report that Johnson made a cryptic confession, claiming Johnson said he "let the white guy live," in reference to Elking. The conviction integrity unit believes this confession was fabricated too.

AD

"The CIU does not believe that Johnson volunteered a confession to Detective Campbell after he denied involvement at arrest, during questioning, throughout trial, and for the twenty-four years thereafter," prosecutors wrote.

Police never investigated his alibi, the investigation found. Instead, they put him in a photo lineup and hauled Elking in to ID him. On the way to the station, Nickerson told him that Johnson was believed to be responsible for a number of unsolved homicides in the city, and so Elking's cooperation was "critical to providing justice for Boyd and his family," according to the report.

Elking failed three times to identify Johnson.

AD

And yet still, this was not the end of Elking's cooperation. In the elevator, police wrote in a report, Elking confided in Nickerson that he "wanted to do the right thing" but that he was "scared" and "needed time to think about what I should do." The police report states that Elking then admitted he "lied" about the previous wrong identifications, and now was ready to make the right ID. He allegedly then chose Johnson and Phil Campbell, the co-defendant who confessed.

Years later, first in a confessional to his pastor and then to prosecutors, Elking would explain that Nickerson gave him the answers — and that he went along out of fear, a guilt that weighed on his conscience until 2003, when he told his pastor he had to lift it.

"I regret not coming to you or anyone else sooner," he wrote. "I don't believe it was the right thing to do then & more so now."

AD

On Elking's false ID alone, bolstered by Nickerson's false reports from witnesses on a possible motive and a jailhouse informant who had incentive to lie, a jury convicted Johnson in July 1995. Remarkably, prosecutors did not dispute his alibi. They simply argued that, in the five minutes Johnson left the apartment, he had time to travel three miles to Boyd's home to kill him and then come back.

Despite all of this, Johnson lost at least six appeals in state and federal courts — even when Johnson presented the two sworn affidavits from the confessed killers.

Part of the problem was that St. Louis Circuit Attorney and St. Louis Police Department continued to block him from obtaining information. When he filed an open records request in 2009 seeking any payments the circuit attorney or police department made to witnesses, he was told there were no records.

In fact, the conviction integrity unit found 63 pages of information about the secret arrangement plus a handwritten ledger describing more than a dozen payments totaling $4,241, apparently to fund housing and moving expenses. The payments began on Nov. 4, 1994 — five days after the shooting and the very first day Nickerson interviewed Elking.

"The documentation in the State's file describes Elking as an "essential witness" and the CIU agrees," prosecutors wrote in the investigative report. "Without Elking, there was no case against Johnson."

The St. Louis Metropolitan Police Department did not immediately respond to a request for comment. Attempts to reach Nickerson and Warren were unsuccessful.

The motion for a new trial filed Monday makes clear that prosecutors consider Johnson an innocent man and do not intend to retry Johnson for murder should a judge grant the motion.

The unit said it tracked down some of the old jurors in Johnson's case, presenting them with the findings. All of them said they would have never convicted them, had they known the facts.

On Tuesday, the Midwest Innocence Project said in a statement that it "praises Circuit Attorney Gardner and the CIU for their work to correct an injustice."

Midwest Innocence Project, "the system is finally being held accountable for its failures in Lamar Johnson's case."

**More from Morning Mix:**

After a girl vanished in 1984, Ronald Reagan pleaded for help. Her body was finally found.

Ole Miss frat brothers brought guns to an Emmett Till memorial. They're not the first.